1  NOSSAMAN LLP
2  THOMAS D. LONG (SBN 105987)
   tlong@nossamam.com
3  DAVID GRAELER (SBN 197836)
   dgraeler@nossaman.com
4  HARLEEN KAUR (SBN 260229)
5  hkaur@nossaman.com
   777 S. Figueroa Street, 34th Floor
6  Los Angeles, California 90017
7  Telephone: 213.612.7800
   Facsimile: 213.612.7801
8
9  Attorneys for the Federal Deposit Insurance
   Corporation as Receiver for Affinity Bank
10

FILED
CLERK, U.S. DISTRICT COURT

AUG - 8 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

11
12            **UNITED STATES DISTRICT COURT**
13            **CENTRAL DISTRICT OF CALIFORNIA**

14  FEDERAL DEPOSIT INSURANCE        Case No.: CV13-05754-JAK
15  CORPORATION AS RECEIVER FOR                  (MANx)
16  AFFINITY BANK

17          Plaintiff,                **COMPLAINT FOR NEGLIGENCE,**
                                       **GROSS NEGLIGENCE, AND BREACH**
18          v.                         **OF FIDUCIARY DUTIES**

19  MICHAEL MCGUIRE, DAVID            **JURY TRIAL DEMANDED**
20  MAHAN, EDWARD SUMMERS,
    DONALD CLINE, CINDY JONES,
21  SONIA HIDALGO, RICHARD
22  FAUSSET, JOANELL LYON, and
    PAUL SCHEDLER,
23
            Defendants.
24
25
26
27
28

443935.DOC
                        **COMPLAINT**

# **TABLE OF CONTENTS**

**Page**

I.  BACKGROUND FACTS. ...................................................................1

II. JURISDICTION AND VENUE .........................................................2

III. PARTIES. ..........................................................................................2

    A.  Plaintiff. ...................................................................................2

    B.  Defendants. ...............................................................................3

IV. GENERAL ALLEGATIONS OF FACTS RELATING TO CLAIMS FOR RELIEF .............................................................................................4

    A.  Background of Affinity Bank and Its Collapse. ........................4

    B.  Affinity's Loan Committee Disregarded Prudent Lending Standards, Known Risks, and Basic Loan Policy Standards. ....5

        1.  Affinity's credit approval process. ...................................5

        2.  Affinity's Loan Committee violated basic loan policy standards for approving CRE and ADC loans.....................6

        3.  Affinity's Loan Committee approved imprudent loans even though it was aware of deteriorating market conditions. ...................9

        4.  Defendants Failed to Reasonably Exercise Their Business Judgment. ......................................................................11

V.  DEFENDANTS  APPROVED OVER $80 MILLION IN LOANS IN CONTRAVENTION OF THE BANK'S LOAN POLICIES AND SOUND BANKING PRINCIPLES. .......................................................12

    A.  Eight Loans. ............................................................................12

        1.  RK Homes Amber Meadows, Inc......................................13

        2.  Fox Hollow Saratoga, LLC ...........................................17

        3.  Dunmore Orchard, LLC...................................................21

-i-
**COMPLAINT**

  4. Chai Investments Group, LLC.................................................24

  5. Gallery Estates Partners, LLC ..........................................25

  6. RWHS Diablo Grande, Legends, LLC ..............................28

  7. Management and Development Services, Inc. ...................30

  8. Lassen View.........................................................................33

VI. CLAIMS FOR RELIEF..............................................................36

  FIRST CLAIM FOR RELIEF – NEGLIGENCE............................36

  SECOND CLAIMS FOR RELIEF – GROSS NEGLIGENCE ........39

  THIRD CLAIM FOR RELIEF – BREACH OF FIDUCIARY
  DUTIES................................................................................43

VII. PRAYER FOR RELIEF...............................................................48

# COMPLAINT

Plaintiff Federal Deposit Insurance Corporation ("Plaintiff" or "FDIC") as Receiver for Affinity Bank ("Affinity" or the "Bank") as and for its Complaint against Defendants alleges as follows:

## I.   BACKGROUND FACTS.

1.      This action is brought by the FDIC in its capacity as Receiver for Affinity. Pursuant to 12 U.S.C. § 1821(d)(2), the FDIC is the successor to all claims of Affinity, including, but not limited to, those of any depositor, accountholder, other creditor, or shareholder.

2.      Affinity failed on August 28, 2009, and was placed into receivership with the FDIC.[1]

3.      Affinity provided commercial real estate ("CRE") loans including acquisition, development, and construction loans ("ADC") in selected markets throughout the United States.

4.      The FDIC seeks to recover at least $52 million of damages suffered by the Bank due to the Defendants'— nine former officers and directors of Affinity— negligence, gross negligence, and breaches of fiduciary duties of care and loyalty in approving eight poorly underwritten ADC and CRE loans (collectively, the "Loans").  In this lawsuit, the FDIC does not seek to collect from Affinity's borrowers or guarantors on any unpaid loans, but rather seeks to collect damages from the Defendants for negligence, gross negligence, and breaches of fiduciary duties.

5.      The FDIC's damages stem from Defendants' significant departures from

---

[1] A tolling agreement effective as of June 15, 2012 was entered into by the FDIC and Defendants which, as amended, tolled and suspended all applicable limitations periods until August 12, 2013, (the "Tolling Agreement").  The FDIC was induced to enter into the Tolling Agreement and to delay filing this action based upon, among other things, Defendants affirmatively agreeing not to raise the statute of limitations or any other time-based defense.

safe and sound banking practices.  Defendants repeatedly disregarded Affinity's credit policies and approved loans to borrowers who were not creditworthy and/or for projects that provided insufficient collateral.  The Defendants' compensation plans encouraged them to push for growth in loan production volume with little regard for credit quality.  Defendants pushed to grow loan production despite substantial warnings and their actual awareness that a significant downturn in the market was imminent and, in some instances, already well underway.  Indeed, Defendants unwisely continued lending in deteriorating markets even after becoming aware of the market decline.  Defendants' decision to do so was especially unreasonable because the CRE and ADC loans they approved were especially vulnerable to even modest downturns in the real estate market.  Defendants' imprudent and even reckless decisions to continue approving the Loans highlighted in this action under these circumstances was negligent, grossly negligent, and constituted breaches of Defendants' fiduciary duties of care and loyalty.

## II.    JURISDICTION AND VENUE.

6.    This is an action arising under the laws of the United States of America, specifically including 12 U.S.C. § 1821(d)(2) and (k) and 12 U.S.C. § 1819(a).  This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.  This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.    The venue of this action is proper pursuant to 28 U.S.C. § 1391(b) because the claims and causes of action asserted herein arose within the Central District of California.

## III.   PARTIES.

### A.    Plaintiff.

8.    Plaintiff is acting in its capacity as Receiver for Affinity, and is authorized to sue pursuant to 12 U.S.C. § 1821(d)(2) and (k).

9.    In accordance with 12 U.S.C. § 1821(d)(2), FDIC as Receiver for Affinity is successor to all claims of Affinity and of any depositor, accountholder, other creditor, or

1  shareholder, is a real party in interest to this action, and is entitled to recover damages for

2  any injuries sustained, including those set forth below.

3  **B.    Defendants.**

4  10.    Michael R. McGuire ("McGuire") is a resident of California and of the

5  Central District of California.  McGuire served as the President and Chief Executive

6  Officer ("CEO") of Affinity from April 1996 until the Bank's failure on August 28, 2009.

7  McGuire also owned 4.9 percent of the stock in the Bank's holding company, Affinity

8  Bank Holding, Inc.  McGuire was a voting member of Affinity's Loan Committee during

9  his entire tenure at Affinity.  McGuire approved all of the Loans that are particularly

10  identified in this Action.

11  11.    David Mahan ("Mahan") is a resident of California and of the Central

12  District of California.  Mahan was the Executive Vice President and Chief Lending

13  Officer from December 1996 until the Bank's failure.  Mahan was a voting member of

14  the Loan Committee during his entire tenure at Affinity and approved all the Loans which

15  are the subject of this Action.

16  12.    Edward Summers ("Summers") is a resident of the State of California and of

17  the Central District of California.  Summers was the Executive Vice President and Chief

18  Credit Officer from November 1997 until the Bank's failure.  Summers was a voting

19  member of the Loan Committee throughout his tenure as CCO.  Summers approved all

20  but one of the Loans which are particularly identified in this Action.

21  13.    Donald Cline ("Cline") is a resident of the State of California and of the

22  Central District of California.  Cline was a Vice President and Underwriting Manager

23  from April 2000 until the Bank's failure.  Throughout his time at Affinity, Cline was a

24  voting member of the Loan Committee.  Cline approved all the Loans that are

25  particularly identified in this Action.

26  14.    Cindy Jones ("Jones") is a resident of the State of California and of the

27  Central District of California.  Jones was a Vice President and Senior Underwriter from

28

443935.DOC                                    -3-

February 2000 until the Bank's failure. Jones was a voting member of the Loan Committee and approved five of the Loans that are particularly identified in this Action.

15. Sonia Hidalgo ("Hidalgo") is a resident of the State of California and of the Central District of California. Hidalgo was a Vice President and Senior Underwriter from February 2000 until the Bank's failure. Hidalgo was a voting member of the Loan Committee and approved three of the Loans that are particularly identified in this Action.

16. Richard Fausset ("Fausset) is a resident of the State of California and of the Central District of California. Fausset was a director and chairman of the board of directors from January 1995 until the Bank's failure. Fausset was a voting member of the Loan Committee and approved four of the Loans that are particularly identified in this Action.

17. Joanell Lyon ("Lyon") was a resident of the State of California and of the Central District of California at all times relevant to this Action. Lyon was a director from January 1999 until the Bank's failure. Lyon was a voting member of the Loan Committee and approved four of the Loans that are particularly identified in this Action.

18. Paul Schedler ("Schedler") is a resident of the State of California and of the Central District of California. Schedler was a director from January 1996 until the Bank's failure. Schedler was a voting member of the Loan Committee and approved five of the Loans that are particularly identified in this Action.

## IV.   GENERAL ALLEGATIONS OF FACTS RELATING TO CLAIMS FOR RELIEF.

### A.   Background of Affinity Bank and Its Collapse.

19. Affinity (originally called San Francisco Thrift and Loan) began operations in 1982 as a state-chartered industrial loan company ("ILC"). By February 2000, although still an ILC, Affinity had become an FDIC-insured state nonmember bank that was wholly owned by Affinity Bank Holding, Inc. ("ABHI"). Prior to 2000, the Bank experienced minimal asset growth with a history of operating losses. From 2000 to 2004,

the Bank's loan portfolio grew rapidly and by 2004, the Bank had a high concentration of CRE loans.  On October 8, 2004, the Bank converted from an ILC to a commercial bank. In 2005, a business plan was adopted that focused on growth in income property loans, asset-based loans, and construction loans.

20.     Affinity qualified for and received deposit insurance from the FDIC and was thereby obligated to conform to the rules and regulations issued by the FDIC regarding its lending policies, management, financial policies, capitalization and loan reserves.  These rules and regulations were designed to prevent loss of the depositors' funds due to imprudent actions by the insured institutions and to protect the FDIC insurance fund.

21.     On August 28, 2009, Affinity was closed by the California Department of Financial Institutions with $1.2 billion in assets.  The FDIC was appointed as receiver of the Bank.  The damages to the FDIC stemming from Affinity's collapse are currently estimated at $297 million.

> **B.     Affinity's Loan Committee Disregarded Prudent Lending Standards, Known Risks, and Basic Loan Policy Standards.**
>
> **1.     Affinity's credit approval process.**

22.     Affinity's loan policy vested loan approval authority within a Loan Committee for approving all CRE loans, including ADC loans.  The Loan Committee included A, B, and C level approvers.  Smaller loans required approval only by A level approvers and the largest loans required approvals from A, B, and C level approvers.  All of the loans at issue in this action required approvals from all three levels.

23.     Under the policy in effect during the relevant period, loans up to $11 million required one A level approval, one B level approval, and two C level approvals.  Loans over $11 million required an additional C level approval.

24.     Although Loan Committee membership varied over time, during the relevant time period, the Defendants on the Loan Committee for each of the loans in this Action included: one A level approver (the underwriter including either Jones or Hidalgo), a B

1  level approver (Cline), and two or more C level approvers (McGuire, Mahan, Summers,

2  Fausset, Lyon, and/or Schedler).

3      25.    For each of the Loans, the Defendants' approval was necessary for loan

4  funds to be disbursed.  Each of the Defendants served on the Loan Committee that

5  approved the Loans.

6      26.    For each of the Loans, a loan underwriter received a loan file containing the

7  required borrower financials, third-party reports, and any other supporting documentation

8  after it had been collected by a loan processor and reviewed by a manager.  The loan

9  underwriter was responsible for analyzing the loan file and preparing the Loan

10  Committee Action ("LCA") form and an accompanying loan summary.  During this

11  process, the loan underwriter worked with the loan processor and sometimes with Cline

12  and Summers.  The underwriter signed the loan summary and the LCA to indicate his or

13  her approval of the loan before the Loan Committee meeting.  The underwriter's

14  signature was necessary for loan approval.

15      27.    The loan policies required that exceptions to the loan policy be listed on the

16  LCA.  The LCA and loan summary explained the transaction, set forth the financial terms

17  of the loan, and included assessments of the borrower, project guarantor/owner, market,

18  and contractor/developer.

19      28.    Affinity's Loan Committee typically met twice a week and the Loan

20  Committee members received an e-mail the day before the meeting with the LCA and its

21  attachments.  The loan file with all of the underwriting documents was available at the

22  meeting.  After the underwriter presented the loan, any questions regarding the loan were

23  addressed (with reference to the loan file if necessary), the Loan Committee voted on the

24  loan, and the approvers signed the LCA if the loan was approved.

25        **2.**    **Affinity's Loan Committee violated basic loan policy**

26            **standards for approving CRE and ADC loans.**

27      29.    The loan policy provided conditions for assessing the viability of

28

443935.DOC                                  -6-

construction projects, including consideration of the general market conditions and property location.  The loan policies were generally prudent and were set forth in a manual that was available to the Defendants.  Though the Defendants were the gatekeepers, charged with ensuring that the Bank's lending practices complied with loan policy standards, the Defendants disregarded the Bank's loan policy standards.

30.     For example, the loan policy required consideration of whether the market was "soft" and whether the area was overbuilt.  In addition, the loan policy required a site inspection, a review of the property's original and current use, and a review of the condition of the property.  These types of policies were all designed to ensure the viability of the Bank's primary source of repayment, *i.e.,* the sale of units being developed.  Other examples of policies that were important for the approval of the loans are as follows:

31.     Loan-to-value ("LTV") ratio limits.  Single-family acquisition and development loans were subject to a maximum current LTV ratio of 65 percent and a maximum "as built" LTV ratio of 75 percent.  Single-family construction loans were subject to a maximum current LTV ratio of 75 percent and a maximum "as built" LTV ratio of 85 percent.  This policy required borrowers to put their own equity into projects so they would have "skin in the game."  It also protected the Bank against depreciating collateral values.  For particularly risky projects, the LTV ratio should be more conservative than the policy limits.  Here, the Defendants often violated LTV ratio limits or approved loans at or near the LTV ratio limits when it was unreasonable to do so.  Defendants also approved loans without carefully understanding the source of the borrowers' equity and whether the borrowers were engaging in 100 percent financing through the use of lines of credit or mezzanine lenders.

32.     More than one repayment source.  Primary and secondary sources of repayment were required.  The Defendants were charged with only approving loans that had more than one potential source of repayment.  Real estate finance is cyclical and a

1    downturn in values is a known risk.  Substantial price depreciation could result in a

2    project becoming economically unviable.  For this reason, the Defendants were required

3    to approve loans that had guaranties from the borrower and guarantors to repay the

4    unpaid loan balance, if necessary.  Here, the Defendants failed to secure meaningful

5    secondary sources of repayment and frequently failed to properly analyze the viability of

6    the stated secondary sources of repayment including failures to engage in basic prudent

7    lending actions such as analyzing their borrowers' and guarantors' contingent liabilities

8    or an assessment of the overall demands on the borrower's and guarantors' cash flow

9    ("global cash flow analyses").

10        33.    Financial Reporting.  Applicants and guarantors were required to provide

11   financial statements and two years of tax returns.  Financial statements were required to

12   be audited or certified as true and correct by the applicant.  These policies were designed

13   to provide current and detailed financial information on the borrowers and guarantors to

14   evaluate their viability as a secondary source of repayment.  The Defendants approved

15   many of the loans at issue in this action with stale and/or insufficient financial statements

16   and tax returns.  In addition, Defendants approved many of the loans at issue in this

17   action with nothing more than self-prepared financial statements.

18        34.    Project Purpose; Due Diligence into Borrower and Guarantors.  Under the

19   loan policy "[a]ppropriate review of the borrower's background and financial condition

20   and the loan's purpose and sources of repayment should never be compromised."  Again,

21   this policy emphasized the need for a strong and independent secondary source of

22   repayment.  Loan approvers were required to "[f]ind[] that the purpose, plan and sources

23   of repayment as well as collateral are acceptable, reasonable, practical, and

24   accomplishable within the framework in which the borrower operates.  Undesirable

25   features of each loan should be documented."  This policy required the Defendants to

26   understand clearly the loan's purpose, and that the plan and sources of repayment were

27   realistic.  Approving loans with major deficiencies such as declining market conditions,

28

1   unexplained appreciation in collateral value, inadequate financial information on the

2   borrowers and guarantors, and unexplained derogatory credit records was unacceptable

3   under the Bank's policies; yet, the Defendants did so systematically.

4          35.    Geographical Lending Limits.  Lending was limited to the Bank's normal

5   lending areas, which included Southern California (Ventura, Los Angeles, Riverside,

6   Orange, San Bernardino and San Diego counties), Northern California (Marin, San

7   Francisco, San Mateo, Alameda, Contra Costa and Santa Clara), Denver, Phoenix, and

8   Las Vegas.  This policy existed to ensure that the Defendants approved loans in markets

9   that were familiar and acceptable to the Bank.  There are substantial and unreasonable

10  risks to a bank when it makes a CRE or ADC loan in an unfamiliar market.  Here, the

11  Defendants frequently approved loans outside the Bank's normal trade area.

12         36.    The Defendants' knowing decision to disregard the Bank's policies and

13  prudent lending practices were severe departures from safe and sound lending, failed to

14  demonstrate even scant care, and constituted negligence, gross negligence, and breaches

15  of Defendants' fiduciary duties of care and loyalty.

16         **3.    Affinity's Loan Committee approved imprudent loans even**

17                **though it was aware of deteriorating market conditions.**

18         37.    Defendants knew, or in the exercise of reasonable due diligence should have

19  known, that their practices and the practices of Affinity's employees who reported to

20  them and over whom they exercised supervisory control, were improper, imprudent, and

21  harmful to Affinity.

22         38.    In particular, Defendants were well aware in 2005 of deteriorating market

23  conditions for CRE and ADC lending.  Defendants were also aware of the perils of

24  lending to borrowers who provided little or no secondary support for the loan (so-called

25  "project-based lending") as early as 2005.  In late-2005 and early-2006, there was also a

26  growing market consensus regarding a real estate bubble and declines in real estate

27  values; these concerns were shared by Bank employees with members of the Loan

28

443935.DOC                              -9-

Committee as well as among the Loan Committee members including the Defendants.

39.     For example, on October 16, 2006, Mitchell Kreeger, the Bank's chief appraiser, sent Loan Committee members Mahan, the Chief Lending Officer, and Summers, the Chief Credit Officer, as well as others an article from the USC Lusk Center for Real Estate, which stated: "As the housing market slows, loan products must also be adjusted. . . . "[C]onduit and local bank lenders will be hurt the most by the housing market adjustment because they have been the most aggressive." After reviewing this report, the Loan Committee approved at least seven of the Loans that are particularly identified in this Action.

40.     Furthermore, on November 13, 2006, the Bank's CEO and President (and Loan Committee member) McGuire received an article entitled, "An American Bubble." The article warned, "US housing has experienced unprecedented price appreciation, both in pace and duration, driven by aberrantly low interest rates.  The correction may have more duration than commonly expected."  It cautioned: "Considering that US home prices have had an unprecedented and lengthy rise, it is hard to conclude that a correction will be short, or in any way delicate.  If past cycles are any indication, the decline will be longer and deeper."  Instead of heeding the cautionary advice, Defendants charged forward and approved at least seven of the Loans that are particularly identified in this Action.

41.     On April 25, 2007, Summers forwarded to Mahan and Cline, the Underwriting Manager, among others, a Los Angeles Times article that reported on the plunge in home sales in March 2007, stating: "The one-month decline is the nation's worst in 18 years.  Experts say the market will remain soft until prices come down." Despite common knowledge in the declining real estate market, the Defendants continued to approve the poorly underwritten and risky Loans set forth in this complaint.

42.     In addition to the articles described above, Defendants were aware of the historic run up in home prices and the numerous lead indicators extant in 2005 and early

2006 of the impending burst of the bubble.  Despite these numerous warnings, Defendants continued to approve risky CRE and ADC loans that were either entirely dependent or virtually entirely dependent on continuing good market conditions for repayment.

43.     Despite numerous market warnings known to Defendants and warnings that should have been known, and despite actual acknowledgements by McGuire, Summers, and Mahan of an impending market decline and a need to tighten credit standards, all of the Defendants continued to underwrite and/or approve risky, speculative, and "project-based" loans that were highly dependent on strong market conditions for repayment into the fall of 2007.

### 4.     Defendants Failed to Reasonably Exercise Their Business Judgment.

44.     The Defendants failed to take reasonable steps to inform themselves about the merits of loans which they approved and, on information and belief, were compensated in a manner that rendered them interested in the transactions they were approving.

45.     In serving on the Loan Committee and in approving the Loans addressed herein, all of the Defendants were acting in the capacity of officers of the Bank and not acting as directors in that they were not setting overall bank policy but instead were performing day-to-day credit decisions of the Bank.

46.     Defendants are not entitled to invoke the affirmative defense of the California Business Judgment Rule and, thus, are liable for their negligence and breaches of the fiduciary duties of care and loyalty.

## V.   DEFENDANTS APPROVED OVER $80 MILLION IN LOANS IN CONTRAVENTION OF THE BANK'S LOAN POLICIES AND SOUND BANKING PRINCIPLES.

### A.   Eight Loans.

47.   The eight Loans consist of ADC and CRE loans approved between September 25, 2006 and September 28, 2007.

48.   Each of the Loans was approved despite inadequate sources of repayment and stale or inadequate verification of the borrowers' or guarantors' financials. On some Loans where Affinity was a participating bank, it approved the loan without adequate investigation into the lead bank. On other participation loans, Affinity took on more than a majority of the loan despite not being the lead bank.

49.   Numerous violations of the Bank's loan policies and safe and sound banking principles are apparent on the face of the LCAs for each of the eight Loans. For example, the Defendants, with willful ignorance and without reasonable inquiry, approved and/or renewed or extended loans:

a.   with deficient collateral;

b.   where one or more of the sources of repayment of the loan were not likely to be sufficient to fully retire the debt;

c.   with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantors;

d.   to borrowers who were or should have been known to be not creditworthy and/or in financial difficulty;

e.   with inadequate appraisals;

f.   outside the normal and prudent trade areas of the Bank;

g.   in markets or on development projects that presented undue risks for default and were not suitable or appropriate;

h.   where there was very little likelihood of the loan repaying within the

term of the loan; and

        i.    in a manner that put their own financial and pecuniary interests ahead of their fiduciary duty of loyalty to the Bank.

50.    None of the Defendants voted against any of the Loans and, on information and belief, none of the Defendants abstained from voting on any Loan.

### 1.    RK Homes Amber Meadows, Inc.

51.    Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and Schedler, as members of the Loan Committee, approved an acquisition and development loan to RK Homes Amber Meadows, Inc. for a project known as Amber Meadows located in Reno, Nevada.  The loan was approved on September 25, 2006 for a total loan commitment of $12,706,500.  As set forth below, Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and Schedler took inadequate steps to reasonably inform themselves of the viability of the primary and secondary sources of repayment, the project, and the market, prior to approving this loan.

52.    The loan amount exceeded the Bank's loan policy's loan-to-one-borrower limits.  There was no mitigating circumstance or "mitigant" identified within the LCA for the additional risks associated with this policy violation.

53.    The LCA showed that the loan was due in 24 months but provided for one 6-month extension.  This violated loan policy requiring that acquisition and development loans have a term of no more than 12 months.  There was no mitigant identified within the LCA for the additional risks associated with this policy violation.

54.    The loan involved the purchase of 96 acres, which would be developed into 322 entry-level single-family-residence lots, in four phases.  The loan would fund the purchase of the land and the development of Phase 1, which included 144 lots, as well as fund infrastructure improvements that would benefit the entire development (i.e., Phases 1-4).

55.    The primary source of repayment for this loan involved the release of the

443935.DOC

Phases for vertical construction.  Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and Schedler anticipated that Affinity or another institution would finance the vertical construction for the site and that such financing would include the funds necessary to pay for the developed lots and therefore repay the loan.  In other words, Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and Schedler approved this loan anticipating that it would be repaid through another loan.  Yet, they took grossly inadequate measures to assess whether a subsequent construction loan would or could be approved.  Thus, the primary source of repayment was illusory at best.  The secondary repayment source was stated to be the liquidation of the guarantors' assets.

56.     The borrower was a single asset entity.  It held no assets or verified liquid reserves.

57.     The loan file does not contain audited or certified financials for the guarantors as required by loan policy.  The LCA notes that the K-1s for the guarantors were not obtained until November 2, 2006, over a month after Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and Schedler approved the loan.  Thus, Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and Schedler took inadequate steps to reasonably inform themselves of the viability of the secondary source of repayment prior to approving this loan.

58.     The LCA stated that one guarantor had verified liquid reserves of approximately $2.3 million and a negative annual cash flow of $3.8 million.  The guarantor's net worth was approximately $566 million; however, much of that was attributed to other real estate and investments that he held.  There was no contingent liability analysis performed on those other real estate assets.  Had Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and Schedler performed a contingent liability analysis, they would have discovered that the contingent liabilities on these other real estate assets greatly exceeded the stated worth of the assets.  The loan file contains two sets of financials from the guarantor, dated three months apart, but reflecting a $54

1   million increase in his assets and an $800,000 increase in his cash accounts.  This was

2   unexplained.

3        59.    The second guarantor had *de minimus* verified liquid reserves of $62,821

4   and negative annual cash flow of $593,310.  His net worth was approximately $63

5   million, but also tied to his interest in other entities and real estate.  Again, Defendants

6   McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and Schedler approved this loan

7   without a contingent liability analysis.

8        60.    The LCA contained no global cash flow analysis for either guarantor.

9        61.    The LCA noted that approximately 60 percent of the borrower's down

10   payment or equity on this loan was financed through a carry-back note by the seller.

11   Thus, the borrower, despite having a fragile financial condition that was inadequately

12   analyzed, also had very little "skin in the game."  This risk was exacerbated by the fact

13   that the borrower's profit margin on this loan was negative.  The LCA indicated that the

14   borrower was projected to lose nearly $17 million on the project being financed by

15   Affinity.  The decision by Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset,

16   Lyon, and Schedler to approve this loan despite these substantial weaknesses where the

17   primary repayment source was a subsequent loan was reckless, demonstrated no care, and

18   was essentially a blind gamble of the Bank's deposits.

19        62.    The project was located in the Reno/Sparks area, outside of Affinity's

20   normal lending area as defined by the Bank's policies.

21        63.    The LCA stated that the Reno/Sparks area experienced "strong growth over

22   the past 30 years" and the population growth had "generally ranged between 3% and 4%"

23   per year.  These statements were pulled out of context from the appraisal report.  The

24   appraisal report also stated that the area had only grown 0.38% from 2004 to 2005.  In

25   addition, the projected growth from 2010 to 2020 was approximately 1%.

26        64.    The appraisal also stated that the Reno/Sparks area would require 9,500

27   homes in the next six years, i.e. 1,500 homes per year.  The LCA included this statement.

28

1   Yet, the LCA failed to mention the appraisal's comments that the area had 33,000 homes

2   projected to be built in the next 15 years.  In other words, the current pipeline already

3   exceeded demand by 700 homes per year.  Defendants McGuire, Mahan, Summers,

4   Cline, Jones, Fausset, Lyon, and Schedler took inadequate steps to inform themselves of

5   these highly saturated and dangerous market conditions.

6        65.    In addition, the appraiser mentioned that demand in the market was "very

7   soft" and there were currently 4,200 homes listed for sale — another indication of a

8   clogged market.  Due to the decline in buyer demand, current home prices were reduced

9   by 20 percent with developers offering incentives to buyers.

10       66.    There was a clear oversupply in the market for the proposed project.  Yet,

11  the LCA only stated that there was a general risk of "oversupply" and that the risk was

12  mitigated based on the developer's experience and because Affinity would not fund

13  vertical development but only the sale of finished lots.  The LCA did not account for the

14  fact that an oversupply of homes could diminish the future demand for lots.  Indeed,

15  values of land or lots are far more severely impacted in market downturns than completed

16  homes.  The fact that no homes were being built through this loan was actually a further

17  weakness and not a mitigant.  Defendants McGuire, Mahan, Summers, Cline, Jones,

18  Fausset, Lyon, and Schedler approved this loan in any event.

19       67.    The project lacked water rights—a requirement for any loan approval under

20  loan policy.  The appraisal noted that the property had "no appurtenant water rights."

21  Nonetheless, Defendants McGuire, Mahan, Summers, Cline, Jones, Fausset, Lyon, and

22  Schedler proceeded to approve this loan.

23       68.    As the loan matured, in late February 2008, the Bank's chief appraiser

24  requested a rush appraisal on the property.  In March 2008, McGuire contacted both the

25  Bank's chief appraiser as well as the appraiser for the property requesting that the

26  appraiser speak with and incorporate information from McGuire's contact in Reno, who

27  had positive input for the project and area.  In particular, McGuire stated that his contact

28

"felt strongly that the new home inventory . . . will be used up by current absorption . . . in 9-10 months." However, McGuire acknowledged that his contact "did not have data on the existing home market or foreclosure activity."

69. In March 2008, the property's appraiser wrote to the borrower and requested updated documents for the appraisal. When the borrower did not timely respond, the Bank's chief appraiser requested that the property appraiser "work around" the missing documents so that the appraisal would be complete prior to a visit by the FDIC regulators.

70. The April 2008 appraisal concluded that the as-is value of the premises, including all four phases, was $8.3 million. The hypothetical value of Phase 1 as-completed was approximately $11 million. In response to inquiries on the appraisal, the appraiser informed the Bank that 41 percent of homes listed for sale were unoccupied and that there was a then-current 12-month supply of homes. The appraiser estimated that all inventory (current and in the pipeline) would sell in ten years.

71. In late April 2008, one of the guarantors filed for bankruptcy.

72. Defendants' negligence, gross negligence, and breaches of fiduciary duties as alleged above, including their recommendation and/or approval of credit to RK Homes Amber Meadows, Inc. caused damages that are estimated to exceed $9.67 million.

### 2. Fox Hollow Saratoga, LLC

73. On November 17, 2006, Defendants McGuire, Mahan, Cline, Jones, and Fausset, as members of the Loan Committee, approved an $11 million loan to Fox Hollow Saratoga, LLC. Affinity was a participating bank on the over $45 million construction loan led by Arkansas National Bank. As alleged below, Defendants McGuire, Mahan, Cline, Jones, and Fausset took inadequate steps to reasonably inform themselves of the viability of the primary and secondary sources of repayment, the project, and the market, prior to approving this loan.

74. The loan approval violated loan policy because it lacked the necessary

1    number of signatures—four Level C approvers—for loans where Affinity was not the

2    lead lender.

3        75.    The loan was to fund a master planned community ("MPC") in Saratoga

4    Springs, Utah, which would include homes, a church, a commercial site and a school.

5    Affinity had never previously funded a master planned community. The loan would: pay

6    off two prior trust deeds (totaling approximately $36 million), fund the remaining

7    infrastructure on the project, and provide an interest reserve for the holding period.

8        76.    The primary source of repayment for the loan was the sale of the home lots

9    and other sites in the MPC. However, the LCA only stated the release price for the home

10   lots. A day before the loan was set to close and after Defendants McGuire, Mahan, Cline,

11   Jones, and Fausset approved the loan, some of the Defendants communicated about the

12   need for a full release schedule. On November 22, 2006, the day after the loan closed,

13   Defendant Summers sent an email to Defendant Cline and others inquiring into the status

14   of the still incomplete release schedule.

15       77.    The secondary source of repayment was the guarantors. However, as

16   explained below, the guarantors lacked sufficient cash flow, reserves, or assets to repay

17   the loan.

18       78.    The borrower was a single-asset entity with no verified liquid reserves. The

19   guarantors' financial information was based on personal financial statements; no bank

20   statements were provided for verification. Both guarantors' net worth were based largely

21   on interests they held in other entities.

22       79.    One guarantor reported a net worth of approximately $44 million and self-

23   reported liquid assets of about $342,000. Yet McGuire, Mahan, Cline, Jones, and Fausset

24   approved the loan despite an acknowledgment in the LCA that they did not obtain bank

25   statements to verify the reported liquid assets. One of the guarantors also had a low

26   FICO score. The second guarantor reported a net worth of approximately $70 million,

27   unverified liquid reserves of $58,000, and a negative annual cash flow of approximately

28

$108,000.  The guarantors were essentially illiquid in comparison to the size of the loan. There was also no contingent liability analysis or global cash flow analysis.  Thus, McGuire, Mahan, Cline, Jones, and Fausset approved this loan without taking reasonable steps to inform themselves of whether the contingent debt of the guarantors was greater than their claimed net worth.

80.     Defendants McGuire, Mahan, Cline, Jones, and Fausset also approved the loan despite several aspects which made the project ineligible for funding.  For example, the project was located in Utah—outside Affinity's lending area as defined by the Bank's policies.  Furthermore, as noted in the appraisal, which Defendant Jones, the Senior Underwriter and Level A approver, would have or should have reviewed to prepare the LCA, the project lacked the necessary water access.  The appraisal was also available to Defendants McGuire, Mahan, Cline, Jones, and Fausset prior to their approval of this loan.  The project was divided into three water zones; but only one of the three water zones had water access.  The Bank's chief appraiser commented that if the other zones could not obtain water rights, their value would approach zero.  There was no mitigant stated for this weakness.  In addition, the initial appraisal indicated that only one of the ten neighborhoods for the residential portions of the MPC had plat approval.

81.     Defendants McGuire, Mahan, Cline, Jones, and Fausset approved this loan despite the lack of water rights, lack of plat approval, and geographic exceptions of the loan.  There was also no profit margin stated in the LCA presumably because it was negative.

82.     The LCA made cursory references to the risks of "unforeseen cost increases, slowing demand, over-supply, and economic changes."  The LCA indicated that these were mitigated by the fact that the borrower was only building infrastructure and selling lots.  However, even Affinity's chief appraiser noted that without water rights, the value of the lots would approach zero.

83.     Defendants McGuire, Mahan, Cline, Jones, and Fausset also approved this

participation loan without first assessing the viability of the lead bank, as required by loan policy. On November 21, 2006 (four days after the Loan Committee approved the loan), a Bank employee asked the Bank's chief financial officer, Gerald Rich, to assess the lead bank, Arkansas. The CFO responded that Affinity needed to thoroughly investigate Arkansas' "construction lending, monitoring and servicing capabilities." The CFO warned that Arkansas appeared to suffer from "understaffing, poor staffing or a relaxation of internal controls or underwriting standards." Affinity did not obtain its own appraisal report. By the date of the CFO's analysis, Affinity had already approved the loan (presumably based on Arkansas' appraisal report and summary) and the loan broker had already closed the loan.

84. Defendants McGuire, Mahan, Cline, Jones, and Fausset approved this loan despite the fact that the LCA showed an appraised value of the land totaling over $76 million and, yet, the land was acquired a mere nine months earlier for $22 million. There was no explanation given in the LCA for this dramatic increase in value over such a short period of time.

85. Approximately a year after loan approval, the Loan Committee began to issue forbearance after forbearance to the borrower. From December 1, 2007 to April 1, 2008, the Loan Committee approved four forbearances.

86. In May 2008, the Loan Committee approved foreclosing on the property.

87. That same month, Arkansas National Bank was closed and placed into receivership.

88. In June 2008, the contractor (an entity owned by one of the guarantors) filed for bankruptcy. Six months later, the guarantor also filed for bankruptcy.

89. In June 2009, the borrower filed for bankruptcy, which halted the foreclosure process.

90. Defendants' negligence, gross negligence, and breaches of fiduciary duties as alleged above, including their recommendation and/or approval of credit to Fox

443935.DOC
-20-
COMPLAINT

1  Hollow Saratoga, LLC caused damages that are estimated to exceed $7.76 million.

2  ### 3.   Dunmore Orchard, LLC

3  91.    On December 13, 2006, Defendants Hidalgo, Cline, Summers, Mahan,

4  McGuire, Schedler, and Fausset, as officers and directors serving on Affinity's Loan

5  Committee, approved a loan for $11,731,000 to Dunmore Orchard, LLC for a project in

6  Marysville, California involving four phases: Phase 5, a commercial site; Phase 6, 121

7  lots; and Phases 7 & 8, 128 lots.  The loan would pay off a prior bank's first trust deed

8  and provide funds to complete construction of lots on one portion of the project.  The

9  loan also included cash out to the borrower to "reimburse" the borrower for work

10  completed.  As set forth below, Defendants Hidalgo, Cline, Summers, Mahan, McGuire,

11  Schedler, and Fausset took inadequate steps to reasonably inform themselves of the

12  viability of the primary and secondary sources of repayment, the project, and the market,

13  prior to approving this loan.

14  92.    The prior first trust deed was for approximately $7 million dollars.  Though

15  Affinity's funds paid off this interest, Affinity failed to secure the necessary

16  subordination agreement.  This oversight required Affinity to file an amended quiet title

17  complaint to equitably subrogate the prior bank's rights.

18  93.    The primary source of repayment was a future speculative loan for vertical

19  construction of homes of the lots.  Defendants Hidalgo, Cline, Summers, Mahan,

20  McGuire, Schedler, and Fausset did not take reasonable steps to inform themselves of the

21  viability of the primary source of repayment because they failed to analyze the viability

22  of a subsequent construction loan before approving the loan.  Indeed, Hidalgo, Cline,

23  Summers, Mahan, McGuire, Schedler, and Fausset approved this loan despite the absence

24  of basic information in the LCA such as the current absorption rate for homes in the

25  market area.  Repayment of the loan depended on the viability of future home

26  construction on the lots and the sale of those homes.

27  94.    Though not indicated on the LCA, Affinity's secondary source of repayment

28

443935.DOC                                  -21-

was a liquidation of the guarantor's assets. The borrower was a single asset entity, managed and owned 100% by one of the guarantors, a parent company. That guarantor was, in turn, owned 100% by the second, related, guarantor. Neither guarantor had sufficient assets or cash flow to repay the loan.

95.     One guarantor provided consolidated audited financials which included information on 27 subsidiary companies. The second guarantor had verified cash reserves of $187,849 and a net worth of approximately $34 million—tied to ten real estate properties. However, the LCA did not contain contingent liability or global cash flow analyses. Thus, there was no indication as to the viability of either of the guarantors' funds or assets in paying off the loan.

96.     Defendants Hidalgo, Cline, Summers, Mahan, McGuire, Schedler, and Fausset also approved the loan notwithstanding indications that the market was trending down. The LCA referenced this risk. The LCA stated that the "housing market could continue to slow due to increasing rates, rising land costs, increasing material costs, and other unforeseen economic issues." This description does not paint the full picture. The appraisal report highlighted several negative market indicators, including: declines in new home sales and median resale prices, increases in consumer debt, and the number of new homes outpacing the number of new jobs in the market.

97.     Moreover, Hidalgo, Cline, Summers, Mahan, McGuire, Schedler, and Fausset approved the loan despite explicit reference in the LCA to the lack of final plan approval for the project. This risk was purportedly mitigated in the LCA by a statement that the County would approve plans once levy bonds were paid; however, there was nothing to assure that the levy bonds would be paid.

98.     This loan was approved despite a policy exception where the loan amount exceeded the single maximum loan-to-one borrower limit.

99.     There was no profit margin stated on this project. This was presumably because the profit margin was negative.

100.   Notably, Phase 6 of the project had conditional water rights and Phases 7 and 8 had none.  Phases 7 and 8 required the construction of a water well, which was estimated to take 5 to 7 years to build.  Under the loan policy, the lack of water rights made the property ineligible for funding.  However, due to Hidalgo's, Cline's, Summers's, Mahan's, McGuire's, Schedler's, and Fausset's insufficient investigation into the project prior to approval, these issues were not discovered until the loan was already in default.

101.   Had Defendants Hidalgo, Cline, Summers, Mahan, McGuire, Schedler, and Fausset taken reasonable steps to inform themselves prior to approving the loan, they would have discovered that the borrower entered into a water rights agreement with the County under which it was granted 120 water permits contingent on finishing improvements on the Phase 6 lots and other areas.  The water rights agreement also expressly stated that Phases 7 and 8 would require the building of a water well.  Ultimately, the County reallocated these 120 water rights because the developer had failed to pay liens on the property or record the final maps for Phase 6.

102.   Defendants Hidalgo, Cline, Summers, Mahan, McGuire, Schedler, and Fausset also approved this loan despite not abiding by loan policy requirements for inspections.  The Bank's chief appraiser indicated that a site inspection was not performed prior to loan approval.  Based on information and belief, a pre-approval site inspection report was prepared after loan approval and back-dated because such an inspection report was discovered after the Bank failed.

103.   As the loan matured, additional deficiencies regarding the project came to light.  In August 2007, the borrower, guarantors, and Affinity were sued by a company that alleged that the borrower failed to reconvey Phase 5 of the project to it.  That same month, the borrower stopped making interest payments.  A month later, one guarantor informed Affinity (who had two loans out to the guarantor) that it needed assistance completing its projects.

443935.DOC

-23-

COMPLAINT

104.   In October 2007, Affinity recorded a notice of default against the borrower.

105.   Defendants' negligence, gross negligence, and breaches of fiduciary duties as alleged above, including their recommendation and/or approval of credit to Dunmore Orchard, LLC caused damages that are estimated to exceed $6.98 million.

### 4.   Chai Investments Group, LLC

106.   Defendants McGuire, Schedler, Fausset, Mahan, Summers, Cline and Jones approved, as officers and directors of the Loan Committee, a loan to Chai Investment Group, LLC for a project known as the Chai-Flagstaff Project.  This loan was entered into on December 13, 2006.  The loan involved the construction of an 800-unit storage facility in Flagstaff, Arizona and mini-permanent financing during occupancy stabilization.  The loan commitment totaled $5,500,000 and had a 24-month term for the initial construction loan and a 36-month term for the mini-permanent loan.  As set forth below, Defendants McGuire, Schedler, Fausset, Mahan, Summers, Cline and Jones took inadequate steps to reasonably inform themselves of the viability of the primary and secondary sources of repayment, the project, and the market, prior to approving this loan.

107.   Defendants approved this loan despite substantial known risks and/or risks that should have been known in the exercise of due diligence, including, but not limited to, the following:

a.   The borrower and guarantors were not creditworthy since the financial statements and financial information from the borrower and guarantors were not prepared by a tax professional, nor certified as true and correct by the borrower and guarantors. Moreover, the borrower and guarantors were essentially illiquid.

b.   The Bank originated the loan even though it was outside the Bank's loan policy approved geographic and community assessment area.

c.   The Bank originated the loan with a Debt Service Coverage ("DSC") Ratio of 1.16x, which failed to meet the minimum loan policy that required DSC Ratio of 1.25x for construction and mini-permanent loans.

108.   Defendants' negligence, gross negligence, and breaches of fiduciary duties as alleged above, including their recommendation and/or approval of credit to Chai Investments Group, LLC caused damages that are estimated to exceed $3.06 million.

### 5.   Gallery Estates Partners, LLC

109.   On January 12, 2007, Affinity's Loan Committee including Defendants Hidalgo, Cline, Mahan, McGuire, Summers, Schedler, Lyon, and Fausset, approved a participation loan to Gallery Estate Partners, LLC for $10,952,550 to fund a project for 32 single-family residences in Menifee, California.  While taking on well over 50 percent of the total value of the loan, Hidalgo, Cline, Mahan, McGuire, Summers, Schedler, Lyon, and Fausset approved this loan despite the fact that Affinity would not be the lead lender.  As set forth below, Defendants Hidalgo, Cline, Mahan, McGuire, Summers, Schedler, Lyon, and Fausset took inadequate steps to reasonably inform themselves of the viability of the primary and secondary sources of repayment, the project, and the market, prior to approving this loan.

110.   Menifee is a secondary market.  In a market downturn, outlying markets compete poorly with products in better markets and, therefore, such secondary markets are hit faster and harder in a market downturn.  By January 2007, market conditions in Menifee were already in substantial decline.

111.   The LCA noted that the "subject's Menifee housing market is softening" and that the "average new home price in West Riverside County decreased in the 2nd quarter of 2006 by 1.6 percent."  Market conditions in Menifee did not improve during the second half of 2006.  And, yet, there was no explanation in the LCA for why the land sold in August 2004 for $2.8 million was valued in the LCA at $4.4 million—an increase of more than 50 percent in only two and a half years.

112.   The LCA also noted stiff competition in the area, as there were four other projects in close proximity.  In other words, Hidalgo, Cline, Mahan, McGuire, Summers, Schedler, Lyon, and Fausset approved a loan in a market with declining prices (reduced

1    demand) where many other new homes would be built at the same time (increasing

2    supply)—a basic, and lethal, combination for a poor market.

3        113.    The LCA plainly stated that a "Risk associated with this request is the

4    possibility of a slowdown in the absorption or declining of homes [sic] prices." McGuire

5    admitted that lower absorption and higher inventory of unsold homes was a relevant fact

6    in whether to approve a loan. Yet, Hidalgo, Cline, Mahan, McGuire, Summers, Schedler,

7    Lyon, and Fausset approved the loan anyway.

8        114.    Although the LCA indicated that the market risks were "mitigated by the

9    overall experience of the borrower and financial strength," there was no express

10   secondary source of repayment in the LCA, and the borrower's and guarantor's finances

11   were unverified. What was known was that the borrower had a cash flow of $456,894

12   and no verified liquid reserves—clearly inadequate in light of the size of the loan.

13       115.    One guarantor had a cash flow of approximately $1.1 million and only

14   $233,078 in verified liquid reserves. The second guarantor had a cash flow of $224,607

15   and no verified liquid reserves. Thus, Hidalgo, Cline, Mahan, McGuire, Summers,

16   Schedler, Lyon, and Fausset approved an $11 million loan in a known risky market where

17   the guarantors provided a combined annual cash flow of less than $2 million and only

18   $224,000 in liquid reserves.

19       116.    Moreover, the LCA noted that the guarantors had $0 net income in 2005—a

20   time when market conditions were still strong. An eight-month profit and loss statement

21   for 2006 revealed a net loss of nearly $90,000 for the developer. In addition, the

22   combined net worth of the borrower and guarantors was roughly $2 million less than the

23   loan amount. If the real estate market continued to drop, other lenders would likely seek

24   to collect from these same guarantors on their other projects under development resulting

25   in a rapid depletion of their net worth. Hidalgo, Cline, Mahan, McGuire, Summers,

26   Schedler, Lyon, and Fausset did not even analyze this risk by evaluating contingent

27   liabilities and global cash flow before approving the loan.

28

117. The strength of the borrowers and guarantors to support a loan was admittedly a "major consideration" according to McGuire. Summers also admitted the necessity of adequate sources of repayment, including collateral and guaranties. Yet, McGuire stated that he could not recall any construction loans where "the guarantors would be sufficient to repay the entire loan if called upon to do so."

118. Despite the notable weaknesses above, Hidalgo, Cline, Mahan, McGuire, Summers, Schedler, Lyon, and Fausset approved the Gallery Estates loan with very high advance rates: The loan-to-cost ratio was 85 percent and the loan-to-completed-value ratio was 81.5 percent.

119. Furthermore, there was no FICO score provided in the LCA for the borrower or the guarantors and the borrower was permitted to borrow over 81.5 percent.

120. To further exacerbate the risk, there was no discussion in the LCA of the source of the borrower's equity in this project. It is possible that the borrower had mezzanine financing or otherwise financed the project without any real equity, a known danger in ADC lending. This risk was amplified by the low 8.19 percent profit margin on this project.

121. In addition to the above weaknesses, loan policy required an environmental questionnaire to be completed by a borrower. However, Affinity did not obtain that report even though the project's appraisal report noted that the preliminary title report revealed potential environmental constraints affecting the property. There was essentially no discussion of this risk in the LCA. Prudent ADC lenders know that environmental constraints could impact the development potential of the property or render development far more expensive. This could impact the viability of the project and the value of the Bank's collateral. Yet, Hidalgo, Cline, Mahan, McGuire, Summers, Schedler, Lyon, and Fausset rationalized their decision to not secure an environmental study by stating that the property had never been developed. But even never-before-developed properties could have environmental constraints. Hidalgo's, Cline's, Mahan's,

1  McGuire's, Summers's, Schedler's, Lyon's, and Fausset's decision to turn a blind eye to

2  a known risk of environmental constraints was unreasonable.

3      122.   Defendants' negligence, gross negligence, and breaches of fiduciary duties

4  as alleged above, including their recommendation and/or approval of credit to Gallery

5  Estates Partners, LLC caused damages that are estimated to exceed $5.25 million.

6              **6.    RWHS Diablo Grande, Legends, LLC**

7      123.   Defendants Jones, Cline, Summers, Mahan, McGuire, Schedler, and Lyon

8  approved a $12,945,000 loan to RWHS Diablo Grande, Legends, LLC on June 20, 2007.

9  The loan was a "Land Inventory Hold Loan" to hold 134 lots in a master planned resort

10 community of Diablo Grande.  The anticipated homes to be developed on the lots were

11 high-end custom homes ranging from $850,000 to $1 million.  The loan term was 12

12 months with a 6-month extension.  As set forth below, Defendants Jones, Cline,

13 Summers, Mahan, McGuire, Schedler, and Lyon took inadequate steps to reasonably

14 inform themselves of the viability of the primary and secondary sources of repayment,

15 the project, and the market, prior to approving this loan.

16     124.   The approval of this loan was extraordinary because the Bank had no loan

17 policy provisions for a Land Hold lending.  Land Hold lending, also known as land

18 banking, is a highly risky and speculative gamble.  This gamble was even riskier given

19 that Jones, Cline, Summers, Mahan, McGuire, Schedler, and Lyon approved the loan in

20 June 2007 when market conditions were in substantial decline.  This loan also violated

21 the Bank's credit policies addressing a single-loan limit.  Unsurprisingly, after the Bank

22 failed, this project transferred to the acquiring institution as other real estate owned or

23 OREO.

24     125.   The repayment sources for this loan were dubious at best.  The LCA only

25 indicated a primary source of repayment: future construction loans for building homes on

26 the lots.  However, that loan would not occur for approximately 12 to 18 months while

27 the lots were on hold.  Whether the lots would ever be developed was questionable as

28

443935.DOC                          -28-

well. Jones, Cline, Summers, Mahan, McGuire, Schedler, and Lyon took woefully inadequate steps to inform themselves of whether a future construction loan would be approved. As an example, there was no absorption rate stated within the LCA covering the time when the loan was approved or, more meaningfully, when the construction loan would be approved.

126. The LCA indicates that the developer had a loan in process with IndyMac Bank, F.S.B. to finance eight model homes and would apply for another loan with Umpqua Bank for the development and construction of 54 homes. However, these loans were "in the works" and speculative; Jones, Cline, Summers, Mahan, McGuire, Schedler, and Lyon did not condition drawing loan documents or funding on actualization of these loans. On information and belief, prior to the property's foreclosure, no lots or homes were developed.

127. The LCA does not indicate any secondary source of repayment, in violation of loan policy. However, the LCA states that the derivative members of the borrower were providing personal guarantees on the loan. Yet, there was little indication that the guarantors were viable sources of repayment.

128. There was no contingent liability analysis or global cash flow analysis performed as to the borrower or guarantors. In addition, one guarantor had a very low FICO score with three 30-day mortgage "lates" and a revolving 30-day "late". Similarly, the second guarantor also had a low FICO score with six 30-day mortgage "lates".

129. Furthermore, neither guarantor provided certified or audited current financials and, prior to loan approval, Jones, Cline, Summers, Mahan, McGuire, Schedler, and Lyon had six-month old financials, in contravention of loan policy.

130. The LCA did not indicate any profit margin for this project. This was presumably because it was negative.

131. Defendants Jones, Cline, Summers, Mahan, McGuire, Schedler, and Lyon approved the loan despite the declining market for home sales. The appraisal detailed the

increase in the unemployment rate and decrease in home prices and demand in the project's market. The LCA did not mention these factors. It blithely stated that risk was mitigated by the experience of "all those involved" and the financial strength of the guarantors.

132. Within a year, in June 2008, the borrower informed the Bank that it would not repay the loan or negotiate a restructuring of the debt.

133. Affinity recorded a notice of default in July 2008.

134. Defendants' negligence, gross negligence, and breaches of fiduciary duties as alleged above, including their recommendation and/or approval of credit to RWHS Diablo Grande, Legends, LLC caused damages that are estimated to exceed $12.9 million.

### 7.     Management and Development Services, Inc.

135. On August 15, 2007, Affinity's Loan Committee including Defendants Jones, Cline, McGuire, Mahan, and Summers approved a $5,480,000 loan to construct a 16-unit townhome project in Reno, Nevada.  As set forth below, Defendants Jones, Cline, McGuire, Mahan, and Summers took inadequate steps to reasonably inform themselves of the viability of the primary and secondary sources of repayment, the project, and the market, prior to approving this loan.

136. By August 2007, the real estate downturn was well underway.  In violation of the loan policy, this project was located outside of the geographic and community assessment areas in the loan policy.  Yet, the LCA provided no mitigant or explanation.

137. Moreover, the LCA reflected a number of red flags that should have alerted Jones, Cline, McGuire, Mahan, and Summers that the collateral value was inaccurate. Among other things, the land had experienced a four-fold increase in its appraised value from its acquisition less than two years earlier.  The land was purchased for approximately $490,000 in December 2005 and valued at $1,970,000 in August 2007. There was no explanation for this sharp increase in value.

138.   The LCA also noted that the absorption rate for this project would be a paltry one unit per month; that with two assumed presales which lacked any factual support, the absorption period would require 14 months.  In other words, this project would not sell out until October 2008 at the earliest, and this apparently assumed sales would commence immediately after the loan was approved—an unreasonable assumption since it takes time to build.

139.   To make matters worse, there was stiff competition as the LCA noted that there "will be an abundance of supply in the area."  Yet the LCA did not define what "an abundance of supply meant" and did not even provide any data on the total number of units for sale.  These market risks were substantial and were admittedly only "partially offset" by matters such as a "well-designed project with individual lots and good amenities as well as pricing consistent with the market."  There was no explanation for why these so-called offsetting factors mitigated the substantial market risks and, in any event, they were admittedly only "partially" offsetting.  In other words, Jones, Cline, McGuire, Mahan, and Summers approved this loan despite unreasonable risks that were not fully mitigated.

140.   Defendants Jones, Cline, McGuire, Mahan, and Summers ignored the complete lack of strength of the borrower and guarantors as a secondary source of repayment.  The borrower and guarantors' combined cash flow was negative $425,000 and they had roughly $235,000 in liquid reserves.  This was hardly sufficient for a $5.48 million loan.  Once again, there was no global cash flow analysis and no contingent liability analysis.

141.   Furthermore, the guarantors' credit reports reflected low FICO scores and one disclosed a Chapter 7 bankruptcy.  There were also several payment delinquencies shown on their credit reports.  These deficiencies were not adequately explained or mitigated in the LCA.  Jones, Cline, McGuire, Mahan, and Summers did not give import to the low FICO scores when approving the loan.  Summers was dismissive of credit

scores and stated that "credit scores would not have been a reason that we would have ever lost money on this loan."

142.   In addition to approving a loan for a project in a weakening market with a borrower and guarantors who were not creditworthy, Jones, Cline, McGuire, Mahan, and Summers also approved a loan structure that was at the maximum LTV ratio under the loan policy.  As mentioned, the property was valued "as-is" at $1.97 million.  The bulk value "as complete" was $6.45 million, yielding an LTV ratio of 85 percent – too high given the other well-defined weaknesses in the loan.

143.   In addition, the project had an extremely low profit margin of 1.25 percent which called into question the economic viability of the project.  The borrower and guarantors also had a demonstrated credit history of not living up to their loan repayment obligations.  Here, Jones, Cline, McGuire, Mahan, and Summers approved a loan where a small drop in home prices would render this project unprofitable for the borrower and guarantors.  If the borrower and guarantors elected not to build the project at a loss, the Bank would be left trying to secure repayment of its loan through a half-completed project and worthless guaranties.

144.   In an effort to sell the properties, the Loan Committee modified the release price of the homes, decreasing it from 125 percent of par to 110 percent and then, again, to 100 percent.  These decreases violated loan policy and required the approval of four or more Level C approvers.  However, the loan modifications only had three Level C signatories.

145.   Up to a month before the Bank was closed, even after the Loan Committee authorized a decrease in the release price of the units, a single unit had not been sold.

146.   Defendants' negligence, gross negligence, and breaches of fiduciary duties as alleged above, including their recommendation and/or approval of credit to Management and Development Services, Inc. caused damages that are estimated to exceed $2.75 million.

### 8.   Lassen View

147.   On September 28, 2007, the Bank's Loan Committee, including Hidalgo, Cline, Mahan, Summers, McGuire, and Lyon, approved a $9,800,000 acquisition and development loan to three entities to complete the site improvements for 67 lots and build 24 energy efficient single-family residences in Red Bluff, California.  As set forth below, Defendants Hidalgo, Cline, Mahan, Summers, McGuire, and Lyon took inadequate steps to reasonably inform themselves of the viability of the primary and secondary sources of repayment, the project, and the market, prior to approving this loan.

148.   Red Bluff is another secondary market that had roughly 14,000 residents at the 2010 census.  A loan proposal on September 28, 2007 in Red Bluff for the acquisition and development of 67 lots and 24 homes should have been viewed with substantial skepticism.

149.   Yet, this loan was approved despite a lack of the requisite repayment sources, obvious financial weaknesses of the borrower and guarantor, and inadequate collateral evaluation.

150.   This project was for the development of energy efficient homes in what the LCA described as a "remote location."  The appraiser noted that value of such green "updates will not equal the cost of putting in the extra features."

151.   The appraiser utilized comparables in urban and suburban areas, located 149 to 152 miles away from the project, because they were energy efficient homes.  Those comparables averaged in the mid to high $400,000.  There were comparables closer (30-40 miles) to the project which did not contain energy efficient features.  Those prices were about $340,000.

152.   Yet, inexplicably, the appraiser used comparables located about 150 miles away rather than closer (and significantly less valuable) comparables.  The LCA even noted that owner-occupied homes within a one-mile radius of this project had vague values of "greater than $300,000."

153.   Defendants Hidalgo, Cline, Mahan, Summers, McGuire, and Lyon should have insisted that this value be clarified because it directly impacted the Bank's collateral.  Despite the adjustments by the appraiser to the urban and suburban comparables, the project was over-valued, especially where the green improvement would not add value to the properties.

154.   Moreover, the appraiser relied on a listing price for a comparable instead of only closed transactions.  This is contrary to appraisal rules and inflated the value of the project.

155.   To make matters worse, the average absorption rate was estimated at only two units per month, and there were indications of builder incentives being offered on the projects that were used as comparables by the appraiser.  Once again, the LCA acknowledged the market risks and stated that they were only "reduced" and not eliminated by mitigating factors such as limiting construction to no more than six homes at a time.  But a limit of six homes still represents 25 percent of the total homes being built.  Prudent lending required that any additional risks be fully mitigated.  Merely "reducing" risk is insufficient.

156.   The collateral value also appears to have been inflated as the property sold in 2005 for just under $2.2 million and, yet, was appraised for $5.7 million just two years later.  There is absolutely no explanation for this massive increase in value.  But Hidalgo, Cline, Mahan, Summers, McGuire, and Lyon still approved this loan.

157.   Despite the known weaknesses in the market and collateral, the LCA again does not contain any identified secondary source of payment.  Though the LCA identified guarantors, their financial condition was suspect.  The LCA listed two guarantors.  Their combined net worth (consisting mainly of their residences) was less than $2 million and there was again no analysis of their contingent liabilities.  Their combined cash flow was roughly $80,000 per year – hardly sufficient to provide meaningful support on a $9.48 million loan.  Once again, there was no global cash flow analysis performed.  As was

common with loans approved by the Loan Committee, one guarantor had a very low FICO score with numerous late payments and a collection account. While this guarantor was clearly not creditworthy, Defendants Hidalgo, Cline, Mahan, Summers, McGuire, and Lyon rationalized his FICO score by claiming that it was mitigated by his two-year average cash flow of just over $50,000 and liquid reserves of $268,000. Reasonable bankers would not consider an annual cash flow of only $50,000 to be meaningful for this loan or loans that were substantially smaller. In essence, the Loan Committee decided that a guarantor with marginal income mitigated his poor credit history.

158.   The borrowers also had minimal net worth, cash flow, and verified reserves. Borrower Lassen View's net worth consisted solely of the collateral: valued at $5.7 million. However, the collateral was encumbered with a loan totaling over $2.7 million. Thus, the net value of the collateral was $3 million and was already put up as security for the loan. Thus, it was not an independent net worth and was woefully insufficient to cover a loan for nearly $10 million. In addition, Lassen had no cash flow and had reserves of only $3,739.

159.   The financial information for borrower UJB was over ten months old and that for borrower RHS appears to be self-reported—not audited or certified. Both conditions violated loan policy. The LCA reflected that UJB and RHS each had a net worth of approximately $6 million, attributable to five jointly owned commercial properties. The LCA contained no contingent liability analysis, leaving uncertain whether other loans or guaranties were tied to these properties. UJB and RHS had respective liquid reserves and cash flow of approximately $3,000 and $9,000 and $26,000 and $24,000. The guarantors were the sole managing members of UJB and RHS, respectively. Neither managing member was required to infuse additional capital into their entity. Thus, no borrower was a viable source of repayment.

160.   Defendants' negligence, gross negligence, and breaches of fiduciary duties as alleged above, including their recommendation and/or approval of credit to Lassen

1  View caused damages that are estimated to exceed $4.54 million.

2  **VI.     CLAIMS FOR RELIEF**

3  <u>**FIRST CLAIM FOR RELIEF – NEGLIGENCE**</u>

4  **(AGAINST DEFENDANTS MCGUIRE, MAHAN, SUMMERS, CLINE,**

5  **FAUSSET, LYON, AND SCHEDLER )**

6      161.    Plaintiff incorporates by reference and re-alleges each of the allegations in

7  paragraphs 1 through 160, inclusive, of this complaint, as though fully set forth herein.

8      162.    Defendants McGuire, Mahan, Summers, Cline, Fausset, Lyon, and Schedler

9  owed Affinity the duty to use reasonable care, skill, and diligence in the performance of

10  their duties, especially in connection with the Bank's commercial real estate lending

11  functions.  These duties included, but were not limited to:

12          a.      To inform themselves about proposed loans and the risks the loans

13  pose to the Bank before they recommended or approved them;

14          b.      To approve loans that conformed with the Bank's loan policy;

15          c.      To ensure that any loans they recommended or approved were

16  underwritten in a safe and sound manner;

17          d.      To ensure that any loans they recommended or approved were secured

18  by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

19          e.      To ensure that any loans they approved did not violate applicable

20  banking regulations and/or create unsafe and unsound concentrations of credit;

21          f.      To approve loans for which they would not obtain a financial benefit

22  at the cost of the interests of the Bank;

23          g.      To conduct the business of Affinity in compliance with all applicable

24  state and federal laws and regulations, and to abide by its own internal policies, including

25  but not limited to loan policies and lending limitations;

26          h.      To establish, enforce and follow careful, reasonable, prudent, and

27  non-negligent lending policies and practices and sound business judgment and candor;

28

443935.DOC                              -36-

1    i.    To ensure the careful, reasonable, prudent and non-negligent

2  underwriting and administration of Affinity loans;

3    j.    To ensure that loans not be made to non-creditworthy borrowers

4  and/or borrowers in financial difficulty;

5    k.    To ensure that loans not be made with inadequate or inaccurate

6  financial information regarding the creditworthiness of the borrower and/or guarantor,

7  and the prospective source of repayment, and the security provided for the loans;

8    l.    To ensure that loans not be made on the basis of inadequate

9  appraisals;

10    m.    To ensure that loans not be made without taking proper and

11  reasonable steps to insure that the loan proceeds would be used in accordance with the

12  loan application;

13    n.    To ensure that loans not be renewed or extended without taking

14  proper steps to obtain security or otherwise protect the Bank's interests;

15    o.    To ensure that loans not be made outside the normal and prudent trade

16  areas of the Bank;

17    p.    To ensure that loans not be made where there was very little

18  likelihood of the loan repaying within the term of the loan;

19    q.    To ensure that there was a reasonable certainty that loans would be

20  repaid;

21    r.    To take reasonable steps to evaluate and approve projects with good

22  primary and secondary sources of repayment;

23    s.    To communicate to the Bank's loan officers and underwriters a clear

24  expectation that they must adhere to sound lending policies and credit underwriting by

25  establishing a system of checks and balances and by careful monitoring of loan officers'

26  conduct;

27    t.    To ensure that loans which required approval pursuant to the Bank's

28

443935.DOC

1    loan policy were sent through correct inspection, underwriting, and approval processes;

2         u.     To properly supervise the lending function and the lending program;

3         v.     To exercise independent judgment in connection with the review and

4    approval or disapproval of loans;

5         w.     To ensure that they Bank had sufficient, capable personnel to

6    undertake and administer the lending policies.

7    163.   Each of the Defendants McGuire, Mahan, Summers, Cline, Fausset, Lyon,

8    and Schedler was negligent in abdicating his or her responsibilities to the Bank as officers

9    and directors of the Bank who also served on Affinity's Loan Committee by

10   unreasonably failing to investigate material facts, failing to act with such care, including

11   reasonable inquiry, as an ordinarily prudent person in a like position would use under

12   similar circumstances, failing to act in good faith, ignoring the danger the negligence was

13   causing the Bank, and/or negligently underwriting, recommending, and approving loans

14   contrary to safe and sound banking practices, as further described in this Complaint, in

15   connection with the Bank's commercial lending functions.  These breaches of duty are

16   exemplified by the factual allegations detailed herein.

17   164.   Defendants McGuire, Mahan, Summers, and Cline as officers of the Bank

18   are not entitled to the application of the business judgment rule.

19   165.   Defendants McGuire, Mahan, Summers, Cline, Fausset, Lyons, and Schedler

20   are not entitled to the application of the business judgment rule as officers and/or

21   directors of the Bank who also served as members of the Bank's Loan Committee

22   because none of these Defendants' actions or inactions which are the basis of this

23   negligence claim were taken in good faith, nor were these Defendants' reasonably well-

24   informed in taking such actions or inactions because each of the Defendants repeatedly

25   approved Loans in violation of the loan policy and banking regulations, and engaged in

26   other high-risk lending practices, without adequate risk management controls or abiding

27   by reasonably prudent lending standards.

28

166.   As a direct and proximate result of the Defendants' negligence, the FDIC suffered damages in an amount to be proven at trial, in excess of $52 million.

## SECOND CLAIMS FOR RELIEF – GROSS NEGLIGENCE
## (IN THE ALTERNATIVE AGAINST DEFENDANTS MCGUIRE, MAHAN, SUMMERS, CLINE, FAUSSET, LYON, AND SCHEDLER)

167.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 166, inclusive, of this complaint, as though fully set forth herein.

168.   Section 1821(k) of FIRREA holds directors or officers of financial institutions personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.  California law defines gross negligence as either a want of even scant care or an extreme departure from the ordinary standard of care.

169.   As officers and directors of Affinity serving as members of its Loan Committee, Defendants McGuire, Mahan, Summers, Cline, Fausset, Lyon, and Schedler owed Affinity a duty of care to carry out their responsibilities by exercising the degree of care, skill, and diligence that ordinarily prudent persons in like positions would use under similar circumstances.  This duty of care included, but was not limited to, the following:

a.   To inform themselves about proposed loans and the risks the loans pose to the Bank before they recommended and approved them;

b.   To approve loans that conformed with the Bank's loan policy;

c.   To ensure that any loans they recommended and approved were underwritten in a safe and sound manner;

d.   To ensure that any loans they recommended and approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

e.   To conduct the business of Affinity in compliance with all applicable state and federal laws and regulations, and to abide by its own internal policies, including but not limited to loan policies and lending limitations;

1     f.  To establish, enforce and follow careful, reasonable, prudent, and

2 non-negligent lending policies and practices and sound business judgment and candor;

3     g.  To ensure the careful, reasonable, prudent and non-negligent

4 underwriting and administration of Affinity loans;

5     h.  To ensure that loans not be made to non-creditworthy borrowers

6 and/or borrowers in financial difficulty;

7     i.  To ensure that loans not be made with inadequate or inaccurate

8 financial information regarding the creditworthiness of the borrower and/or guarantor,

9 and the prospective source of repayment, and the security provided for the loans;

10     j.  To ensure that loans not be made on the basis of inadequate

11 appraisals;

12     k.  To ensure that loans not be made without taking proper and

13 reasonable steps to insure that the loan proceeds would be used in accordance with the

14 loan application;

15     l.  To ensure that loans not be renewed or extended without taking

16 proper steps to obtain security or otherwise protect the Bank's interests;

17     m.  To ensure that loans not be made outside the normal and prudent trade

18 areas of the Bank;

19     n.  To ensure that loans not be made where there was very little

20 likelihood of the loan repaying within the term of the loan;

21     o.  To properly inform themselves and each other about the true nature

22 and condition of the Bank's loan portfolio, and to adequately review and inquire into the

23 Bank's loan transaction;

24     p.  To recognize problem assets and to establish adequate loss reserves

25 therefore;

26     q.  To place the financial interests of the Bank before their own personal

27 financial interests;

28

443935.DOC        -40-

r.     To ensure that there was a reasonable certainty that loans would be repaid;

s.     To take reasonable steps to evaluate and approve projects with good primary and secondary sources of repayment;

t.     To exercise independent judgment in connection with the review and approval or disapproval of loans;

u.     To ensure that any loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit; and

v.     To approve loans for which they would not obtain a financial benefit at the cost of the interests of the Bank.

170.   For each of the Loans approved by each Defendant in his or her role on the Loan Committee, Defendants McGuire, Mahan, Summers, Cline, Fausset, Lyon, and Schedler, through their gross negligence, breached their duties of care by, among other things, failing to exercise even scant care or acting in a manner constituting an extreme departure from the ordinary standard of care by:

a.     Causing the Bank to make CRE and ADC loans without proper analysis of borrowers' or guarantors' ability to repay them;

b.     Failing to inform themselves about the risks the Loans posed to the Bank before they approved them;

c.     Approving the Loans with terms inconsistent with the Bank's loan policy;

d.     Approving the Loans though the proposed project was classified as an ineligible property for lending under the Bank's loan policy;

e.     Approving the Loans though the proposed project fell outside the Bank's trade area;

f.     Failing to ensure that the Loans were underwritten in a safe and sound manner;

443935.DOC

-41-

g.     Failing to ensure that the Loans were secured by sufficiently valuable collateral to prevent or minimize the risk of the loss to the Bank;

h.     Failing to ensure that the Loans did not violate applicable banking regulations or create unsafe and unsound concentrations of credits; and

i.     Failing to take action to prevent the reoccurrence of any unsafe or unsound banking practice that came to their attention.

171.   In addition, Defendants McGuire, Mahan, Summers, Cline, Fausset, Lyon, and Schedler breached their duties of care and loyalty and were grossly negligent in connection with each loan they approved because they knew or should have known that each of the Loans involved one or more of the following characteristics, which increased the risk of default:

a.     A property that lacked water rights, in violation of Affinity's own loan policy;

b.     An excessive LTV ratio, as measured by applicable regulatory standards and Affinity's own loan policy;

c.     A deficient or incomplete appraisal;

d.     Permitting minority participation partners to be retained as lead services on participation loans;

e.     Reliance on participant bank due diligence and/or broker representation in lieu of independent diligence;

f.     Improper use of interest reserves;

g.     Deficient or inadequate environmental and engineering analyses;

h.     A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

i.     A project in a secondary market with softening demand or deteriorating market conditions;

j.     Insufficient proof of pre-sales and/or necessary market demand; or

k.      Insufficient collateral.

172.   Each Defendant was grossly negligent in that his or her manner of carrying out his or her duties and responsibilities to the Bank constituted a want of even scant care or an extreme departure from the ordinary standard of care, as further described in this Complaint.

173.   As a direct and proximate result of the Defendants' gross negligence, the FDIC suffered damages in an amount to be proven at trial, in excess of $52 million.

## THIRD CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTIES
## (AGAINST DEFENDANTS JONES AND HIDALGO AND IN THE ALTERNATIVE AGAINST DEFENDANTS MCGUIRE, FAUSSET, LYON, SCHEDLER, MAHAN, SUMMERS, AND CLINE)

174.   Plaintiff incorporates by reference and re-alleges each of the allegations in paragraphs 1 through 173, inclusive, of this complaint, as though fully set forth herein.

175.   During all or part of the relevant times, Defendants—Director Defendants Fausset, Lyon, and Schedler, and the Officer Defendants Mahan, Summers, Cline, Jones, and Hidalgo, and Officer and Director Defendant McGuire—served on Affinity's Loan Committee.

176.   Defendants owed fiduciary duties of due care and loyalty to Affinity to act with the utmost care and in the best interests of the Bank, which included supervising management in the design, implementation, and operation of lending to protect the Bank against excessive and unreasonable risk.  That duty, in turn, included, but was not limited to, a duty to ensure that they designed and implemented lending policies that complied with safe and sound lending practices including the following duties:

a.      To conduct the business of Affinity in compliance with all applicable state and federal laws and regulations, and to abide by its own internal policies, including but not limited to loan policies and lending limitations;

b.      To establish, enforce and follow careful, reasonable, prudent, and

non-negligent lending policies and practices and sound business judgment and candor;

      c.     To ensure the careful, reasonable, prudent and non-negligent underwriting and administration of Affinity loans;

      d.     To ensure that loans not be made to non-creditworthy borrowers and/or borrowers in financial difficulty;

      e.     To ensure that loans not be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower and/or guarantor, and the prospective source of repayment, and the security provided for the loans;

      f.     To ensure that loans not be made on the basis of inadequate appraisals;

      g.     To ensure that loans not be made without taking proper and reasonable steps to insure that the loan proceeds would be used in accordance with the loan application;

      h.     To ensure that loans not be renewed or extended without taking proper steps to obtain security or otherwise protect the Bank's interests;

      i.     To ensure that loans not be made outside the normal and prudent trade areas of the Bank;

      j.     To ensure that loans not be made where there was very little likelihood of the loan repaying within the term of the loan;

      k.     To properly inform themselves and each other about the true nature and condition of the Bank's loan portfolio, and to adequately review and inquire into the Bank's loan transaction;

      l.     To recognize problem assets and to establish adequate loss reserves therefore;

      m.     To place the financial interests of the Bank before their own personal financial or pecuniary interests;

      n.     To ensure that there was a reasonable certainty that loans would be

repaid;

o.    To take reasonable steps to evaluate and approve projects with good primary and secondary sources of repayment;

p.    To adopt such careful, reasonable and prudent policies and procedures, including those related to lending and underwriting, as required to ensure that the Bank did not engage in unsafe and unsound banking policies, and to ensure that the affairs of the Bank were conducted in accordance with these policies and procedures;

q.    To communicate to the Bank's loan officers and underwriters a clear expectation that they must adhere to sound lending policies and credit underwriting by establishing a system of checks and balances and by careful monitoring of loan officers' conduct;

r.    To require that sufficiently detailed, current and reliable information be provided upon which the directors and officers of the Loan Committee could make prudent decisions, including the use of current technology and internal control procedures to timely identify problems and allow for early remediation;

s.    To support and foster the Bank's internal risk management functions;

t.    To enforce policies and procedures designed to ensure that loans would not be made based on inadequate or inaccurate information;

u.    Upon receiving notice of an unsafe or unsound practice, to make a reasonable investigation thereof and to exercise reasonable business judgment with respect to all facts that a reasonable investigation would have disclosed, by acting with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances;

v.    To carefully review reports of examinations and other directives or regulatory agencies, to carry out the instructions and orders contained in those reports, to investigate and cure problems noted therein, and to prevent any repetition of such problems and deficiencies;

w.     To inform themselves about proposed loans and the risks that loans posed to the Bank before they determined whether to approve them;

x.     To ensure that loans which required approval pursuant to the Bank's loan policy were sent through correct inspection, underwriting, and approval processes;

y.     To properly supervise the lending function and the lending program;

z.     To ensure that any loans they approved were underwritten in safe and sound manner;

aa.    To ensure that the loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

bb.    To ensure that they Bank had sufficient, capable personnel to undertake and administer the lending policies;

cc.    To ensure that any loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit;

dd.    To exercise independent judgment in connection with the review and approval or disapproval of loans;

ee.    To ensure that any loan approved did not increase their own compensation at the cost of putting the Bank at an unreasonable risk for losses; and

ff.    To otherwise pursue financial policies that are reasonable, safe and consistent with the purposes of the insurance of Affinity's accounts.

177.   Defendants breached their fiduciary duties of care and loyalty by, among other things:

a.     Failing to ensure that the design, implementation, and operation of the Bank's lending policies met appropriate standards;

b.     Adopting and/or implementing unreasonable and imprudent lending and underwriting policies and procedures that amounted to unsafe and unsound banking practices with respect to loans in the Bank's portfolio;

c.     Causing the Bank to make commercial real estate loans with little or

1  no regard for borrowers' or guarantors' ability to repay them;

2          d.      Failing to ensure proper review and approval of participation loans;

3          e.      Failing to ensure that loans, including the Loans, were underwritten in

4  a safe and sound manner;

5          f.      Failing to ensure that loans, including the Loans, were secured by

6  sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

7          g.      Failing to take all necessary actions upon loan approval to ensure that

8  the Bank obtained and monitored its security interests in the collateral securing loans,

9  including the Loans;

10         h.      Failing to ensure that lending procedures, including those utilized in

11 regard to the Loans, did not violate applicable banking regulations or create unsafe and

12 unsound concentrations of credit;

13         i.      Failing to take action to prevent the reoccurrence of any unsafe and

14 unsound banking practice that came to their attention; and

15         j.      Causing or allowing a loan to be made in order to increase their own

16 compensation despite putting the Bank at an unreasonable risk for losses.

17     178.   In committing the foregoing breaches, the Defendants acted unreasonably

18 under the circumstances known to them at the time, and otherwise wholly abdicated their

19 corporate responsibilities by closing their eyes to known risks, did not act in good faith

20 and did not act with the belief that their actions were in the best interests of the Bank.

21     179.   As a direct and proximate result of the Defendants' breaches of their duties

22 of care and loyalty, the FDIC suffered damages in an amount to be proven at trial, in

23 excess of $52 million.

24

25

26

27

28

1  VII.   **PRAYER FOR RELIEF.**

2        **WHEREFORE**, Plaintiff prays for relief against Defendants on all counts as

3  follows:

4        A.     For compensatory and consequential damages, jointly and severally, in a

5  minimum amount of $52 million and any excess amount to be proven at trial;

6        B.     For its costs of suit against all Defendants;

7        C.     For prejudgment interest;

8        D.     For attorneys' fees, costs for the investigation and litigation; and

9        E.     For such other and further relief as this Court deems just and proper.

10

11  DATED: AUGUST 8, 2013            NOSSAMAN LLP
                                     THOMAS D. LONG
12                                   DAVID GRAELER
                                     HARLEEN KAUR
13

14

15                                   By
16                                           DAVID GRAELER
                                     ATTORNEYS FOR FEDERAL DEPOSIT
17                                   INSURANCE CORPORATION, AS RECEIVER
                                     OF AFFINITY BANK
18

19

20

21

22

23

24

25

26

27

28

443935.DOC                              -48-
                                      COMPLAINT

## JURY DEMAND

Plaintiff FDIC requests a trial by jury for all claims alleged herein.

DATED: AUGUST 8, 2013

NOSSAMAN LLP
THOMAS D. LONG
DAVID GRAELER
HARLEEN KAUR

By: _____

DAVID GRAELER
ATTORNEYS FOR FEDERAL DEPOSIT
INSURANCE CORPORATION, AS RECEIVER
OF AFFINITY BANK

443935.DOC

-49-

COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____John A. Kronstadt_____ and the assigned Magistrate Judge is _____Margaret A. Nagle_____ .

The case number on all documents filed with the Court should read as follows:

## 2:13-CV-5754-JAK (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

_____August 8, 2013_____
Date

By  MDAVIS_____
Deputy Clerk

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

☐ Western Division
312 N. Spring Street, G-8
Los Angeles, CA 90012

☐ Southern Division
411 West Fourth St., Ste 1053
Santa Ana, CA 92701

☐ Eastern Division
3470 Twelfth Street, Room 134
Riverside, CA 92501

**Failure to file at the proper location will result in your documents being returned to you.**

CV-18 (08/13)            NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

Nossaman LLP
Thomas D. Long (SBN 105987)
David Graeler (SNB 197836)
Harleen Kaur (SBN 260229)
777 S. Figueroa Street, 34th Floor
Los Angeles, CA 90017

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AFFINITY BANK<br><br>PLAINTIFF(S)<br>v.<br>MICHAEL MCGUIRE, DAVID MAHAN, EDWARD SUMMERS, DONALD CLINE, CINDY JONES, SONIA HIDALGO, RICHARD FAUSSET, JOANELL LYON, AND PAUL SCHEDLER<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV13-05754-JAK(MANx)<br><br><br>SUMMONS |

TO: DEFENDANT(S): MICHAEL MCGUIRE, DAVID MAHAN, EDWARD SUMMERS, DONALD CLINE, CINDY JONES, SONIA HIDALGO, RICHARD FAUSSET, JOANELL LYON, AND PAUL SCHEDLER

    A lawsuit has been filed against you.

    Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Nossaman LLP, whose address is 777 S. Figueroa Street, 34th Floor, Los Angeles, CA 90017. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

                                             Clerk, U.S. District Court

Dated: AUG - 8 2013

By:     **MARILYN DAVIS**
             Deputy Clerk

             *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR AFFINITY BANK | MCGUIRE, MICHAEL; MAHAN, DAVID; SUMMERS, EDWARD; CLINE, DONALD; JONES, CINDY; HIDALGO, SONYA; FAUSSET, RICHARD; LYON, JOANELL; SCHEDLER, PAUL |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) |
|---|---|
| Nossaman LLP<br>Thomas D. Long (SBN 105987)<br>David Graeler (SNB 197836)<br>Harleen Kaur (SBN 260229))<br>777 S. Figueroa Street, 34th Floor<br>Los Angeles, CA 90017<br>Telephone No.: (213) 612-7800 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

- ☒ 1. U.S. Government Plaintiff
- ☐ 2. U.S. Government Defendant
- ☐ 3. Federal Question (U.S. Government Not a Party)
- ☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

- ☒ 1. Original Proceeding
- ☐ 2. Removed from State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Reinstated or Reopened
- ☐ 5. Transferred from Another District (Specify)
- ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT: $ 52 million +**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Negligence and breach of fiduciary duties

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☒ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:** CV13-05754

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ NO ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☒ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, Ventura, Santa Barbara | Arizona |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Ventura | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
**Note:** In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _David Graeler_     DATE: August 8, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

American LegalNet, Inc.
www.FormsWorkFlow.com